IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KENDRA DAVENA HARRY,

               Plaintiff,

    v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security
Administration,[1]

            Defendant.

CIVIL ACTION FILE NO.

1:15-CV-01514-JFK

## FINAL OPINION AND ORDER

Plaintiff in the above-styled case brings this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration which denied her application for disability insurance benefits. For the reasons set forth below, the court **ORDERS** that the Commissioner's decision be **AFFIRMED**.

### I.    Background & Procedural History

The claimant Kendra Davena Harry ("Ms. Harry") filed applications for disability insurance benefits and supplemental security income in August 2011 alleging that she became disabled on September 1, 2009. [Record ("R.") 13, 132–42, 158].

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013.

After her applications were denied initially and on reconsideration, an administrative hearing was held on November 6, 2013.  [R. 13, 30–67, 76–88].  The Administrative Law Judge ("ALJ") issued a decision denying Plaintiff's applications on December 13, 2013, and the Appeals Council denied Plaintiff's request for review on March 12, 2015.  [R. 1–6, 13–23].  Plaintiff filed her complaint in this court on May 5, 2015, seeking judicial review of the Commissioner's final decision.  [Doc. 3].  The parties have consented to proceed before the undersigned Magistrate Judge.[2]

The ALJ found that Plaintiff suffered from the following severe impairments: morbid obesity, depression, asthma, sleep apnea, hypertension, and a history of substance abuse.  [R. 15].  Although these impairments are "severe" within the meaning of the Social Security regulations, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  [R. 16].  Plaintiff was found not to be capable of performing her past relevant work as a retail sales clerk / store manager.[3]  [R. 21].  However, the ALJ concluded that

---

[2] Oral argument was held in this matter on August 24, 2016, at which time the parties were provided an opportunity to address the Court concerning their strongest legal argument.  Counsel for Claimant elected to dedicate oral argument speaking time to her first issue on appeal, alleged cherry-picking by the ALJ.

[3] The Vocational Expert ("VE") described the claimant's past relevant work as: Sales Clerk (DOT # 290.477-014), which is classified as work of a light level of

AO 72A
(Rev.8/82)

there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.  [R. 22–23].  The ALJ, therefore, found that Plaintiff has not been under a disability since September 1, 2009, the amended alleged onset date, through the date of decision, issued December 13, 2013.  [R. 23].

The decision of the ALJ [R. 15–23] states the relevant facts of this case as modified herein as follows:

The claimant alleges an inability to work due to morbid obesity, anxiety with panic attacks, sleep apnea, depression and exhaustion (Ex. 3E).  At her hearing, the claimant testified that she is entirely dependent on her mother and has little social interaction.  She further testified that she suffers from panic attacks on a daily basis that cause a breakdown in her ability to function.  With regard to physical impairments, the claimant testified that she can only walk one block before she has to stop and rest. She further testified that she has to elevate her feet due to swelling and that she spends most of her time in a recliner.

The claimant's mother testified that the claimant has emotional outbursts and reacts inappropriately to comments and conversations.  She further testified that the claimant cries on a daily basis and interacts only with her mother and boyfriend.

---

exertion, with an SVP of 3; and Manager, Retail Store (DOT # 185.167-046), which is classified as work of a light level of exertion, with an SVP of 7. The VE testified that the claimant performed this work at the medium level of exertion.  [R. 62].

The medical evidence documents that the claimant has a history of morbid obesity and hypertension. The claimant, who stands at 64 inches, reportedly weighed 434 pounds as of March 25, 2013 (Ex. 17F). Accordingly, her body mass index ("BMI") of 76.88 kg/m$^2$ constitutes class III obesity per SSR 02-1p. With regard to hypertension, treatment notes dated January 23, 2013, document that the claimant's blood pressure was 140/90 (Ex. 15F).

The claimant also has a history of asthma and sleep apnea. However, treatment notes dated May 7, 2009, document that the claimant was not using her prescribed CPAP machine (Ex. 4F). The claimant also reported she was not using a CPAP machine during her physical consultative examination on April 26, 2012 (Ex. 13F). Further, treatment notes do not indicate any functional limitations caused by asthma or sleep apnea.

With respect to opinion evidence concerning physical impairment, Dianne Bennett-Johnson, M.D. ("Dr. Bennett-Johnson"),  performed a physical consultative examination on April 26, 2012.  Upon examination, Dr. Bennett-Johnson documented that the claimant had only minor limitation in range of motion, secondary to obesity. She further documented that the claimant had a normal, but slightly wide-based, gait and was able to tandem walk.  Based on her examination, Dr. Bennett-Johnson

AO 72A
(Rev.8/82)

diagnosed the claimant with morbid obesity, polycystic ovarian syndrome ("PCOS") and sleep apnea (Ex. 13F).

On October 26, 2011, Valeria Malak, M.D. ("Dr. Malak"), completed a case analysis on behalf of Disability Determination Services ("DDS"). Based on her review of the evidence, Dr. Malak opined that the claimant's physical impairments were non-severe (Ex. 7F, 8F).[4]

John Hassinger, M.D. ("Dr. Hassinger"), opined on May 26, 2012, with regard to obesity. Based on his review of the evidence, Dr. Hassinger determined the claimant's physical impairments were non-severe (Ex. 14F).

In addition to her physical impairments, the claimant suffers from depression, with treatment from the Winn Way Mental Health Center, part of the DeKalb Community Service Board ("DeKalb CSB"), from December 11, 2008, through August 29, 2013.[5] During that period, the claimant was typically rated with global

_____

[4] The ALJ noted, however, that Dr. Malak's opinion appeared to be based on a misreading of the medical evidence with regard to obesity. [R. 18–19].

[5] The ALJ refers to the outpatient treatment facility Claimant attended as the "Winn Way Mental Health Center." [R. 19]. For clarification purposes only, it appears that the facility was located on Winn Way and that "Winn Way" or "MH Winn Way" was shorthand for that particular branch of the DeKalb CSB, which is referred to later in this Final Opinion and Order as the DeKalb County Mental Health Center ("DeKalb MHC"). These terms are used interchangeably. The ALJ also stated that Claimant attended treatment at the Winn Way Mental Health Center through November 1, 2010, which is factually incorrect. [R. 19]. Although the services Claimant participated in,

5

assessment of functioning scores ("GAF") ranging from 51 to 55 (Ex. 4F).[6]   These

scores indicate that the claimant had moderate limitations with regard to her ability to

function socially and occupationally according to the DSM-IV.

On January 7, 2009, the claimant was seen by Manjula Kallur, M.D. ("Dr.

Kallur"), for a psychiatric diagnostic interview.  [R. 611–12].  At that time, Ms. Harry

reported that her chief objective was to obtain therapy.  [R. 611].  Dr. Kallur's

evaluation notes Claimant's chronic depressive symptoms, including dysphoria,

worthlessness, concerns about her weight, self-mutilation, and self-reported

interpersonal issues.  [R. 611].  Claimant reported being unmedicated for the last two

years and indicated that she preferred not to be treated with medication.  [R. 611].  Dr.

---

and the level of care may have fluctuated, Claimant received services from DeKalb
MHC through at least August 2013 (Ex. 16F).

    [6] GAF is a standard measurement of an individual's overall functioning level
"with respect only to psychological, social and occupational functioning."  American
Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders, at 32
(4th ed. 1994) ("DSM-IV").  A GAF of 31-40 indicates some impairment in reality
testing or communication or major impairment in several areas, such as work or
school, familiar relations, judgment, thinking, or mood.  Id.  A score between 41 and
50 indicates serious symptoms, such as suicidal ideation, serious impairment in social,
occupational or school functioning.  Id.  A score between 51 and 60 indicates moderate
symptoms, such as occasional panic attacks or moderate difficulty in social,
occupational or school functioning.  Id.  "[T]he GAF scale is just one tool used by
clinicians to develop the clinical picture and it cannot be used in isolation from the rest
of the evidence to make a disability decision."  Penna v. Colvin, 2015 WL 859091, at
*4 (M.D. Fla. February 27, 2015).

Kallur noted that Ms. Harry may benefit from therapy. [R. 612]. No diagnosis was made and no medications were prescribed. [R. 612].

On September 13, 2009, the claimant was hospitalized after overdosing on Ativan (Ex. 1F). The claimant explained that she did not want to die but that she wanted to get the attention of her boyfriend and her mother who were not paying attention to her concerns (Ex. 4F at 32). [R. 613].

On November 18, 2009, the claimant underwent psychiatric evaluation by Minninder J. Sandhu, M.D. ("Dr. Sandhu"), with DeKalb MHC (Ex. 4F).[7] [R. 613–14]. Dr. Sandhu diagnosed the claimant with major depressive disorder, dysthymia, and borderline personality disorder (or "BPD"). Dr. Sandhu prescribed Zoloft for the claimant and recommended weekly therapy and possibly a DBT (dialectical behavioral therapy) group.

The claimant participated in both individual and group therapy through the DeKalb MHC regularly through August 29, 2013 (Ex. 16F). Beginning in or around

---

[7] This record is referenced by the ALJ when mentioning the claimant's suicide attempt in September 2009 and claimant's rationale for the overdose. [R. 19 (citing to Ex. 4F at 32 - part of Dr. Sandhu's evaluation)]. The ALJ's decision does not discuss the fact that Ms. Harry had a psychiatric evaluation done in 2009 through DeKalb MHC or that Dr. Sandhu made diagnoses of specific mental impairments. Instead, the ALJ's decision summarizes the outpatient records by stating that claimant received treatment for depression. [R. 19]. In fact, Claimant's chief complaint at the time of Dr. Sandhu's evaluation was depression. [R. 613].

May 2011, Kay L. Ibarra, LPC ("Ibarra"), became Claimant's individual therapist. In addition to counseling and group therapies, DeKalb MHC personnel oversaw the management of Claimant's medication and provided her access to the services of a dietician.

Two psychological consultative examinations were performed. At the request of the DDS, Steven Berger, Ph.D. ("Dr. Berger"), performed a psychological evaluation of the claimant on February 21, 2011.[8] Upon examination, Dr. Berger documented that the claimant was able to pay attention during the interview and that her recent and immediate memory were intact. Based on his evaluation, Dr. Berger diagnosed the claimant with depressive disorder and anxiety disorder (Ex. 5F).

With regard to functional limitations, Dr. Berger determined that the claimant would be able to understand and carry out simple and complex instructions. However, he found that her ability to maintain an adequate psychological pace appeared to be mildly interrupted by her sad mood. Dr. Berger further opined that the claimant would likely be able to consistently adhere to a workday or week and that she is not at risk

---

[8] Dr. Berger noted at the outset of his written report that he had relatively few treatment records to review in connection with his evaluation of Claimant. [R. 634]. However, in addition to information provided by the Claimant and / or her mother, Dr. Berger was provided two staffing notes from DeKalb CSB suggesting diagnoses of major depressive disorder, neurotic depression, and anxiety. [R. 634].

8

of decompensation under stress as she had worked under stress before and had emotional support from her mother (Ex. 5F).

Subsequently, Sarah Howell, Ph.D. ("Dr. Howell"), performed a psychological evaluation of the claimant on December 5, 2011.  Based on her evaluation, Dr. Howell diagnosed the claimant with major depressive disorder and borderline personality disorder.  At that time, she rated the claimant with a GAF score of 60 (Ex. 9F).  This score indicates that the claimant has moderate limitations with regard to her ability to function socially and occupationally according to the DSM-IV.

With regard to functional limitations, Dr. Howell determined the claimant's ability to relate to others, including peers, supervisors and the general public, was within normal limits.  She found that the claimant's mental ability to maintain attention and complete simple tasks was within normal limits.  She further opined that the claimant retained the ability to withstand the stresses and pressures associated with most day-to-day work settings (Ex. 9F).

Two mental residual functional capacity assessments were completed by state agency employed physicians.  On December 31, 2011, W. Miller Logan, M.D. ("Dr. Logan"),  a state agency employed psychologist, opined that the claimant was limited to performing simple repetitive work-related tasks in a setting where interaction with co-workers is brief and superficial (Ex. 10F).  On April 9, 2012, Daniel Malone, Ph.D.

9

("Dr. Malone"), opined that the claimant could understand, remember and carry out instructions of at least two or three steps. In addition, he determined the claimant would not be seriously limited from performing work-related tasks over the course of a normal workday or workweek because of excessive slowing, interruption or degradation in performance from the symptomatology of her mental impairments (Ex. 12F).

Dr. Logan also completed a psychiatric review technique ("PRT") form on December 31, 2011 (Ex. 11F).  Dr. Logan rated the claimant's restrictions as mild in activities of daily living, moderate in social functioning and moderate in concentration, persistent and pace (Ex. 11F).  He found that the claimant had experienced no episodes of decompensation of extended duration.  Dr. Logan acknowledged that the medical evidence of record suggested that claimant's primary condition is BPD.  However, Dr. Logan noted that claimant was "[c]ognitively intact but does have hx [history] of conflicts with supervisors and mood swings" (Ex. 11F at 13).  [R. 670].

With regard to activities of daily living ("ADLs"), treatment notes dated March 18, 2011, document that the claimant was able to do all activities of daily living (Ex. 2F at 161).   Dr. Berger documented that the claimant reported attending church one or two times a month, visiting with a friend once a month, spending time researching dog rescues online, and spending time with her mother (Ex. 5F).  Dr. Berger reported

10

that the claimant was able to structure and independently execute her activities of daily living, when she chooses to do so (Ex. 5F).  Dr. Berger explained that "claimant's portrayal of her ADLs appears under-reported in that she is able to complete more tasks, such as cooking, but she states that she just does not want to."  [R. 636].

Treatment notes dated May 6, 2011, document that the claimant had no problem with focus and attention (Ex. 16F). [R. 765].  Further, Dr. Berger reported the claimant could carry out complex instructions and that her pace would be only mildly interrupted by her sad mood (Ex. 5F).  Dr. Berger noted the claimant was cooperative and was able to establish good rapport (Ex. 5F).

Treatment notes dated January 23, 2013, document that a physical examination was unremarkable and that exercise five times per week for 30 minutes at a time was recommended.  At that time, the claimant reported her energy was better and she was napping less (Ex. 15F).

Treatment notes dated June 21, 2011, document that the claimant was volunteering up to 30 hours per week at an animal shelter.  Further, treatment notes dated May 19, 2011, document the claimant was earning money by babysitting.[9]

---

[9] Dr. Berger's report indicates that Claimant was babysitting 3 to 5 hours per week and earning $10 per hour.  [R. 636].

AO 72A
(Rev.8/82)

Treatment notes dated May 2, 2012, document that the claimant had a business making jewelry and was preparing for a show (Ex. 16F).

The ALJ determined that claimant has the residual functional capacity to perform a limited range of sedentary work as defined in 20 CFR §§ 404.1567(a) and 416.967(a).[10] The claimant's ability to perform the full range of sedentary work is compromised because she can never climb ladders, ropes or scaffolds and can only occasionally climb stairs or ramps.  In addition, the claimant is limited to occasional bending, balancing, stooping, crawling, kneeling or crouching.  Further, the claimant should avoid occupations with hazardous machinery and concentrated  exposure to fumes, dust, heat, moisture and pulmonary irritants.  Moreover, the claimant is limited to simple, routine, repetitive tasks and needs to work in a low production occupation that requires no complex decision-making, constant change or dealing with crisis situations.

The ALJ relied upon the testimony of a vocational expert ("VE") to determine the extent to which the limitations noted within the RFC erode the unskilled sedentary

---

[10] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

12

occupational base.  The VE was asked whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity.  The VE testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as cashier II, small products assembler, and product sorter.[11]  [R. 22–23].

## II.    Standard

An individual is considered to be disabled if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).   The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work but cannot, considering

---

[11] According to the VE, Cashier II (DOT # 211.462-010), is classified as "light" with an SVP of 2.  However, although classified as light work, this classification includes sedentary jobs of which there are 2,300 jobs regionally and 80,000 jobs nationwide.  Similarly, Small Products Assembler (DOT # 706.684-022), classified as "light" work, with an SVP of 2, includes sedentary jobs of which there are 600 jobs regionally and 30,000 jobs nationwide.  Finally, Product Sorter (DOT # 521.687-086), is classified as "sedentary" work, with an SVP of 2, with 600 jobs regionally and 25,000 jobs nationwide.

age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  See 42 U.S.C. §§ 423(d)(2) and (3).

"We review the Commissioner's decision to determine if it is supported by substantial evidence and based upon proper legal standards." Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Id. at 1440.  "Even if the evidence preponderates against the [Commissioner's] factual findings, we must affirm if the decision reached is supported by substantial evidence." Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). "'We may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner].'" Phillips v. Barnhart, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004) (quoting Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983)).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits." Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).   Under the regulations as promulgated by the Commissioner, a five step sequential procedure is followed in order to determine whether a claimant has met the burden of proving his disability.  See Doughty, 245 F.3d at 1278; 20 C.F.R. §§ 404.1520, 416.920.  At step one, the claimant must prove that he has not engaged in substantial gainful activity.

14

See id.  The claimant must establish at step two that he is suffering from a severe impairment or combination of impairments.  See id.  At step three, the Commissioner will determine if the claimant has shown that his impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  See Doughty, 245 F.3d at 1278; 20 C.F.R. §§ 404.1520, 416.920.  If the claimant is able to make this showing, he will be considered disabled without consideration of age, education, and work experience.  See id.  "If the claimant cannot prove the existence of a listed impairment, he must prove at step four that his impairment prevents him from performing his past relevant work."  Doughty, 245 F.3d at 1278.  "At the fifth step, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides his past relevant work."  Id.  If, at any step in the sequence, a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends.  See 20 C.F.R. §§ 404.1520(a), 416.920(a).

### III.    Findings of the ALJ

1.    The claimant meets the insured status requirements of the Social Security Act through March 31, 2014.

2.    The claimant has not engaged in substantial gainful activity since September 1, 2009, the alleged onset date (20 CFR §§ 404.1571 *et seq*., 416.971 *et seq*.).

3.    The claimant has the following severe impairments: morbid obesity; depression; asthma; sleep apnea; hypertension; and a history of substance abuse (20 §§ C.F.R. 404.1520(c), 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a limited range of sedentary work as (defined in 20 C.F.R. §§ 404.1567(a), 416.967(a)). The claimant's ability to perform the full range of sedentary work is compromised because she can never climb ladders, ropes or scaffolds and can only occasionally climb stairs or ramps. In addition, the claimant is limited to occasional bending, balancing, stooping, crawling, kneeling or crouching. Further, the claimant should avoid occupations with hazardous machinery and concentrated exposure to fumes, dust, heat, moisture and pulmonary irritants. Moreover, the claimant is limited to simple, routine, repetitive tasks and needs to work in a low production occupation that requires no complex decision-making, constant change or dealing with crisis situations.

6.    The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565, 416.965).

7.    The claimant was born on January 23, 1980, and was 29 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date (20 C.F.R. §§ 404.1563, 416.963).

16

8.    The claimant has at least a high school education and is able to communicate in English (20 C.F.R.  §§ 404.1564, 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR §§ 11404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR  §§ 404.1569, 404.1569(a), 416.969, 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 1, 2009, through the date of this decision (20 CFR  §§ 404.1520(g), 416.920(g)).

## IV.   Discussion

On appeal, Plaintiff asserts that the Commissioner's decision should be reversed because 1) the ALJ disregarded "obviously probative" evidence and instead cited only to isolated portions of the record  ("cherry-picked") to support the  denial of benefits; and 2) the ALJ failed to show that Plaintiff is capable of working "in an ordinary work setting" without special accommodations.   [Doc. 16 at 1, 9, 16].

### A.    ALJ's Alleged Failure To Account For "Obviously Probative" Evidence

Claimant's first argument on appeal is that the ALJ engaged in "cherry-picking" in order to support the denial of benefits.  Claimant, through counsel, identifies the three categories of "obviously probative" evidence that the ALJ allegedly disregarded

17

in formulating Plaintiff's RFC and in evaluating her credibility. The evidence will be discussed first and then the undersigned will briefly speak to the impact of this evidence and the ALJ's treatment of it on the RFC and credibility determination.

**1.     Failure To Account For Therapist's "Opinions"**

Plaintiff contends that the ALJ erred in failing to consider the opinions of her therapist, Ms. Ibarra with DeKalb MHC, MH Winn Way. Although Ibarra did not formally provide an opinion as to Claimant's mental RFC, Plaintiff argues that the therapist's observation that Claimant experienced stress with lesser, more flexible obligations than what she would encounter in competitive employment, is probative of Claimant's ability to sustain full-time work on a regular basis.

More specifically, Claimant points to her therapist's suggestion found in two discrete treatment notes that Claimant reduce her extra-curricular commitments and focus more on her overall health. Ibarra's treatment notes dated June 22, 2011, read in part:

> Cl [Claimant] identified stress related to her volunteer job at the animal shelter as a contributing factor to depression and overeating. Th [Therapist] worked with [Claimant] to explore how the volunteer work is a stressor in her life. [Claimant] gained insight that she should reduce volunteer hours from 30 per week to 25 and take those five hours for self care. [Therapist] gave [Claimant] homework to exercise daily and maintain food journal.

[R. 768].  Ibarra's record documenting a May 8, 2012, therapy session follows the

same school of thought and provides in part:

> [Claimant] stated need to talk about feeling "overwhelmed and over
> extended."  She disclosed that she has a craft business making jewelry
> and is getting ready for a show.  She is also very involved in animal
> rescue. [Claimant] stated "I let it get out of control, I get too many things
> going and can't manage it all." [Therapist] used CBT [cognitive
> behavioral therapy] to help [Claimant] work on developing perspective
> that she is the one overextending herself.  Used solution focused therapy
> to help [Claimant] develop plan to gain control and set realistic limits.
> [Claimant] agreed to develop a daily schedule to limit the time spent on
> each of her interests and include exercise and meal times.

[R. 784].  Notably, Ibarra never advised Claimant to discontinue her volunteer work

or other activities.

As an initial matter, Ibarra, a licensed professional counselor (or therapist), falls

into the "other source" category of evidence for purposes of the sequential evaluation

process.  See 20 C.F.R. §§ 404.1513(d), 416.913(d).  SSR 06-03P provides that, "In

addition to evidence from 'acceptable medical sources,' we *may* use evidence from

'other sources' . . . ."  SSR 06-03P, 2006 WL 2329939, at *2 (August 9, 2006)

(emphasis added).  Given this language, the Commissioner contends that the ALJ was

under no duty to explicitly address Ibarra's instruction to Ms. Harry about time

management.  Id; and see, e.g., Voronova v. Astrue, 2012 WL 2384414, at *2–4 (M.D.

Fla. May 7, 2012) (noting distinction drawn in SSR 06-03P between what adjudicator

19

must "consider" and what adjudicator must "explain" and holding that the ALJ was not required to explicitly address chiropractor's opinion or indicate weight assigned), <u>adopted by</u> 2012 WL 2384044 (M.D. Fla. June 25, 2012).   In essence, the Commissioner suggests that the ALJ's reliance on evidence from "other sources" is discretionary.

SSR 06-03P acknowledges that the regulations "do not explicitly address how to consider relevant opinions and other evidence from 'other sources.'" SSR 06-03P, at *3 (citing 20 C.F.R. §§ 404.1513(d), 416.913(d)).   However, SSR 06-03P emphasizes that the Social Security Act requires the Commissioner to *consider* all of the available evidence in the individual's case record while stating that "other source" evidence is "important and *should be* evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR 06-03P, at *2–3 (citations omitted) (emphasis added).   In other words, the best practice is for the ALJ to consider evidence from other sources if probative of severity of impairment and functional limitation.[12]

---

[12] If relied upon, the same factors prescribed for evaluating "acceptable medical sources" apply in determining the weight to be attributed to Ibarra's records.  <u>See</u> SSR 06-03P, at *4 ("Although the factors in 20 CFR §§ 404.1527(d) and 416.927(d) explicitly apply only to the evaluation of medical opinions from 'acceptable medical sources,' these same factors can be applied to opinion evidence from 'other sources.'").

20

Here, the ALJ considered and specifically referenced several of the treatment records from DeKalb MHC (or MH Winn Way) and the range of GAF scores documented within, which indicates that even if the ALJ did not explicitly address Ibarra's treatment notes, they were considered along with the other DeKalb MHC records.[13] [R. 19, 21].  Additionally, the ALJ considered the RFC opinions of multiple "acceptable medical sources" and these sources had the opportunity to review and consider Claimant's historical treatment record including her psychotherapy with Ibarra.  It is not clear from SSR 06-03P that more was required.  Under <u>Voronova</u>, cited by the Commissioner, the ALJ was not required to explicitly address Ibarra's guidance or advice to Claimant – which the undersigned does not construe as an "opinion" as to Claimant's mental RFC in any event.  <u>See</u> <u>Voronova</u>, 2012 WL 2384414, at * 2–4.  Moreover, the cases cited by Claimant for the proposition that the ALJ's discussion and analysis of "other source" evidence is mandatory [Doc. 10 at 12 & n.52] are inapposite in that they speak of the ALJ's failure to consider and explain the weight assigned to opinions of "acceptable medical sources."  <u>See</u> <u>Cabarra v. Astrue</u>, 393 Fed. Appx. 612, 614 (11th Cir. 2010) (treating physician opinion); <u>and see</u>

---

[13]   Claimant makes the same argument with respect to Dr. Sandhu's records which the ALJ did not explicitly identify but necessarily considered.

21

Davis v. Comm'r of Social Security, 449 Fed. Appx. 828, 832 (11th Cir. 2011) (treating

psychiatrist opinion).  Ideally, the ALJ's decision (a perfect decision) would have

identified the various therapists that worked with Ms. Harry over the course of her

treatment, including Ibarra, and expressly noted any pertinent observations relative to

functional limitations.  The fact that this was not done, however, is not reversible error.

### 2.    Failure To Evaluate All Impairments

Plaintiff contends that the ALJ failed to evaluate and consider all of her

impairments, including her diagnoses of BPD, anxiety disorder, and anemia, none of

which were deemed "severe" by the ALJ for purposes of step two of the sequential

evaluation process.[14]  According to Claimant, the ALJ's failure to consider all of

Claimant's severe and non-severe impairments means that the ALJ's RFC and

credibility determinations cannot be supported by substantial evidence.

---

[14] Plaintiff does not contend that the ALJ erred in not designating these impairments as severe at step two of the sequential evaluation process.  As a rule, "[t]he finding of any impairment or a severe combination of impairments satisfies step two because once the ALJ proceeds to step three and assesses the RFC, he is required to consider all of a claimant's impairments, severe or not." Himes v. Comm'r of Social Security, 585 Fed. Appx. 758, 762 (11th Cir. 2014) (citing Jamison v. Bowen, 814 F.2d 585, 588 (11th Cir. 1987); and Bowen v. Heckler, 748 F.2d 629, 634–35 (11th Cir. 1984); and 42 U.S.C. § 423(d)(2)(B)).

22

### a.     Borderline Personality Disorder Diagnosis

Claimant argues that the ALJ committed reversible error by failing to discuss and consider her BPD diagnosis.  Claimant suggests that BPD diagnosis is "highly relevant to the ability to relate appropriately to coworkers and supervisors."  [Doc. 10 at 14].  The record reveals that the ALJ considered Ms. Harry's BPD diagnosis as well as the evidence concerning her social functioning.

It is undisputed that the ALJ acknowledged that Dr. Howell, a consultative examiner, made the BPD diagnosis and that the ALJ attributed "significant weight" to the opinion of Dr. Howell.[15]  [R. 19–20].  Dr. Howell conducted a psychological status examination of Claimant on December 5, 2011, which included a face-to-face clinical interview, administration of the Mini-Mental State Examination ("MMSE"), and the Rey 15-Item Test (Ex. 9F).  Also relevant is that Dr. Howell's evaluation confirmed a previous diagnosis of BPD – the diagnosis apparently first made by Dr. Sandhu at DeKalb MHC.[16]  [R. 651].  In the "Medical and Psychiatric History" section of Dr.

---

[15] Dr. Logan also observed that Ms. Harry's "primary condition is Borderline PD."  [R. 670].  The ALJ only gave portions of Dr. Logan's medical opinion significant weight and gave Dr. Logan's opinion that Claimant has "a limited ability to interact with coworkers" little weight.  [R. 20].

[16] Although Dr. Howell's report does not identify Dr. Sandhu by name, Dr. Howell refers to a psychiatric evaluation conducted on November 18, 2009, the date

23

Howell's evaluation, Dr. Howell wrote, "A review of her records from the DeKalb Community Service Board indicates a diagnostic impression of Major Depressive Disorder, Dysthymia, and Borderline Personality Disorder." [R. 651]. Dr. Howell noted that Claimant reported participating in outpatient counseling and antidepressant treatment since age thirteen (13) and that Claimant was "currently receiving counseling and antidepressant medication for anxiety and depression through the DeKalb Community Service Board." [R. 651].

Dr. Howell thoroughly addressed Claimant's social and occupational functioning. For example, in Dr. Howell's summary of Claimant's ADLs, she discussed Claimant's most recent work history and noted that Claimant had "told her manager off in a fit of rage and was fired" from a photography job she held for almost a year with Lifetouch Studios. [R. 652]. Dr. Howell also commented on Claimant's attempt working in two other retail positions since Lifetouch but noted that each attempt only lasted a few days due to Claimant "walking out of the job due to anxiety." [R. 652]. Dr. Howell noted that Claimant's reported typical day included: "wake up,

---

of Dr. Sandhu's evaluation. [R. 651]. Dr. Howell identifies the mental health records she reviewed in connection with her evaluation as follows: "Psychiatric Evaluation – DeKalb Community Service Board – Manjula Kallur, MD – 1/7/2009, 11/18/2009, and Jacquelyn Owens, APRN – 5/6/2011." [R. 651].

get online, take a 2 hour nap, do a few more things online, eat dinner, watch TV, get online, go to bed." [R. 652]. In the "Behavioral Observations and Mental Status" section of the evaluation, Dr. Howell noted that Claimant's "task persistence was good" and "[r]apport was established." [R. 652]. Speaking directly to "Work-Related Mental Abilities," Dr. Howell opined:

> The claimant's mental ability to relate to others, including peers, supervisors, and the general public is assessed to be within normal limits. The claimant's mental ability to follow through with simple one, two, and three step instructions and/or directions is assessed to be within normal limits. The claimant's mental ability to maintain attention to do simple tasks is assessed to be within normal limits. The claimant's mental ability to withstand the stresses and pressures associated with most day to day work settings is assessed to be within normal limits.

[R. 653]. Finally, notwithstanding the BPD diagnosis (and notwithstanding Claimant's self-reported most recent efforts to secure employment), Dr. Howell's diagnostic impression was in part that Claimant "would *benefit* from behavioral strategies to decrease her depression; such as an increase in her activity level and gainful employment." [R. 653 (emphasis added)]. The record demonstrates that the ALJ, relying in part on Dr. Howell's examination and medical opinion, adequately considered Claimant's BPD diagnosis and impact.

25

### b.  Anemia Diagnosis

Claimant also argues that the ALJ failed to consider her anemia which Ms. Harry contends is probative of Claimant's complaints of fatigue. [Doc. 10 at 14]. According to Claimant, anemia is relevant to her ability to sustain regular and full-time work. [Doc. 10 at 14].  Although Claimant cites to self-reported complaints of fatigue in the record, Claimant is unable to point to any treating source who opined as to functional limitations related to her fatigue.  The ALJ relied upon and assigned significant weight to the medical opinion of Dr. Berger.  Dr. Berger noted that Claimant reported experiencing fatigue "nearly every day" – one of several symptoms he described as being reflective of depression.  [R. 638].  However, despite Claimant's allegations of fatigue, Dr. Berger ultimately opined that Claimant's work history demonstrated her ability to maintain employment notwithstanding complaints of depression and anxiety.  [R. 638].  The record demonstrates that the ALJ, relying in part upon Dr. Berger's examination and medical opinion, adequately considered Claimant's anemia diagnosis and complaints of fatigue.

### c.  Anxiety Disorder

Claimant contends that the ALJ's conclusions that Ms. Harry's anxiety is non-severe cannot be reconciled with the mental health treatment notes and the testimony

26

of Claimant's mother.[17]  [Doc. 10 at 15].  Claimant suggests that in the absence of a

statement from the ALJ concerning the weight attributed to this evidence, substantial

evidence review is not permitted and that the ALJ failed to "build a logical bridge

between the evidence and his conclusion."  [Doc. 10 at 15 (quoting Shauger v. Astrue,

675 F.3d 690, 697–98 (7th Cir. 2012))].  The Court disagrees.

With respect to anxiety, the ALJ found Claimant's impairment non-severe and

stated that "the medical evidence fails to demonstrate that this impairment has more

than a minimal effect on the claimant's ability to perform basic work activities."[18]  [R.

15].   First, the ALJ acknowledged and assigned significant weight to Dr. Berger's

medical opinion, which included a diagnosis of anxiety disorder.  [R. 637].  Dr. Berger

---

[17] It is noteworthy that the evidence Claimant cites to, and even the evidence Dr. Berger relied upon, is comprised almost wholly of Ms. Harry's self-reports.  Claimant also points to her mother's testimony about Ms. Harry's frequent panic attacks, self-mutilation, her tendency to jump into abusive romantic relationships, her dependency on her mother, her episodes of rage and screaming at her mother, and her difficulty relating to other people.  [Doc. 10 at 15].

[18] In conjunction with this argument, Claimant's brief also asserts that the ALJ found that her "social limitations are mild." [Doc. 10 at 15 (citing R. 15–16, 20–21)].  This assertion is not supported by the record in that the ALJ (and references to the record pages cited by Claimant) consistently find that Ms. Harry has "moderate" restriction or limitations in social functioning.  [R. 15–16, 20–21].  As previously discussed, the classification of Claimant's anxiety disorder as non-severe is inconsequential as long as the ALJ adequately considered the impairment and related functional limitations.  See Himes, 585 Fed. Appx. at 762 (citations omitted).

described Ms. Harry's anxiety symptoms in detail, noting her report that "she suffered from depression and panic attacks since age 8," that "she feels the anxiety internally," that "she feels like she wants to crawl out of her skin," and that she "sometimes feels so anxious and stressed that she vomits"; yet Claimant denied having a racing heart, shortness of breath, or pacing. [R. 634–35, 637]. Claimant reported to Dr. Berger that "she has these anxiety symptoms on and off throughout the day five days per week." [R. 635].

Speaking to Claimant's alleged anxiety-related limitations, Dr. Berger opined that Claimant was over-reporting the impact of her symptoms associated with depression and anxiety. [R. 637]. Dr. Berger based this opinion on inconsistencies in Claimant's reporting such as Ms. Harry's claim that her depressive and anxiety symptoms had remained the same since their onset during adolescence despite maintaining employment in the past while experiencing these symptoms. [R. 637]. In addition, Dr. Berger pointed to Ms. Harry's assertion that she is not able to do household chores because of pain and fatigue along with her admission that she just doesn't want to do chores – the latter explanation being supported by her mother's report that Claimant is lazy. [R. 637]. Further, Dr. Berger spoke to Claimant's employment history and her past mechanism for coping with anxiety in the workplace

28

(to leave or hide).   [R. 634, 636].  Claimant reported that she could not give 100% at work given her focus on the "physical and emotional pain of anxiety."   [R. 636]. Claimant advised Dr. Berger that she "has had good relationships with coworkers" but not always with her supervisors.  [R. 636].  Dr. Berger was also aware that Claimant felt disrespected by her photography supervisor and "told her off."  [R. 636].

In addition to relying on Dr. Berger's medical opinion, the ALJ discussed Ms. Harry's claim that she suffered from panic attacks on a daily basis and her allegation that panic attacks cause a breakdown in her ability to function but noted that the treatment records simply did not support this allegation.  [R. 17].  Thus, the record demonstrates that the ALJ adequately considered Claimant's anxiety disorder and related functional limitations.

### 3.    Failure To Account For Other Evidence

Claimant finally contends that the ALJ failed to account for certain portions of the evidentiary record – a reframing of the "cherry-picking" argument.  Claimant suggests that the ALJ erred in not discussing the testimony of Ms. Harry's mother and in not discussing the outpatient treatment records documenting Claimant's therapy. This argument is without merit as "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's

29

decision . . . is not a broad rejection which is 'not enough to enable [the reviewing court] to conclude that [the ALJ] considered her medical condition as a whole.'" <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1211 (11th Cir. 2005) (quoting <u>Foote v. Chater</u>, 67 F.3d 1553, 1561 (11th Cir. 1995)).   The ALJ decision in this case is far from a broad rejection devoid of explanation.

In any event, the ALJ's decision makes clear that the ALJ considered the testimony of Ms. Harry's mother as well as the outpatient records from DeKalb MHC, which records have already been addressed.  Ms. Harry's mother's testimony is "other source" evidence.  <u>See</u> 20 C.F.R. §§ 404.1513(d) and 416.913(d).   As such, the ALJ was not required to explicitly address this evidence.   <u>See</u> <u>Voronova</u>, 2012 WL 2384414, at *2–4.  Furthermore, the ALJ did not credit all of Claimant's mother's testimony for the same reasons Claimant's testimony was found not entirely credible concerning the severity of her limitations.  [R. 21].  The ALJ identified the activities of daily living that she found were inconsistent with Claimant's alleged limitations (i.e., volunteering 30 hours a week, babysitting, and jewelry business) and then explained that "the evidence shows a higher level of functioning than the claimant *and her mother* described at the hearing." [R. 21 (emphasis provided)].  Again, the ALJ is

not required to detail and specifically discuss every piece of evidence.  See <u>Dyer</u>, 395

F.3d at 1211 (citation omitted).

### 4.   The ALJ'S RFC Is Supported By Substantial Evidence

In determining Claimant's RFC, which the undersigned finds is supported by

substantial evidence, the ALJ acknowledged Claimant's combined severe and non-

severe impairments and took into account all documented functional limitations.

"The residual functional capacity is an assessment, based upon all of the relevant

evidence, of a claimant's remaining ability to do work despite [her] impairments. . . .

Along with [her] age, education and work experience, the claimant's residual

functional capacity is considered in determining whether the claimant can work."

<u>Lewis</u>, 125 F.3d at 1440 (citing 20 C.F.R. §§ 404.1545(a), 404.1520(f)).  "RFC

includes physical abilities, such as sitting, standing or walking, and mental abilities,

such as the ability to understand, remember and carry out instructions or to respond

appropriately to supervision, coworkers and work pressure."  <u>Dempsey v. Comm'r of

Social Security</u>, 454 Fed. Appx. 729, 731 n.3 (11th Cir. 2011) (citation omitted).  In

determining the claimant's RFC, the ALJ is required to consider the limiting effects

of all the claimant's impairments, even those that are not severe.  See <u>Phillips</u>, 357

F.3d at 1238 ("[T]he ALJ must determine the claimant's RFC using all relevant

medical and other evidence in the case."); and see Jones v. Dept. of Health & Human Servs., 941 F.2d 1529, 1533 (11th Cir. 1991) (citation omitted) ("Where a claimant has alleged several impairments, the Secretary has a duty to consider the impairments in combination and to determine whether the combined impairments render the claimant disabled."); 20 C.F.R. § 404.1545(e).

Social Security Ruling 85-15, which governs the evaluation of mental impairments not of listing severity, provides:

> The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

SSR 85-15, 1985 WL 56857 (January 1, 1985).

In the present case, the ALJ's RFC as to Plaintiff Harry reads as follows:

> [C]laimant has the residual functional capacity to perform a limited range of sedentary work as (defined in 20 CFR §§ 404.1567(a) and 416.967(a)). The claimant's  ability to perform the full range of sedentary work is compromised because she can never climb ladders, ropes or scaffolds and can only occasionally climb stairs or ramps.  In addition, the claimant is limited to occasional bending, balancing, stooping, crawling, kneeling or crouching.   Further, the claimant should avoid occupations with

hazardous machinery and concentrated  exposure to fumes, dust, heat, moisture and pulmonary irritants.  Moreover, the claimant is limited to simple, routine, repetitive tasks and needs to work in a low production occupation that requires no complex decision-making, constant change or dealing with crisis situations.

[R.17].

The Court focuses on the mental RFC consistent with Claimant's filings and argument.  During oral argument, counsel for Claimant emphasized that the ALJ did not discuss the BPD diagnosis or attribute any weight to the opinion of Dr. Sandhu, the treating psychiatrist with DeKalb MHC that originally diagnosed BPD.[19]  Claimant, through counsel, suggests that the ALJ's failure to do so presents both a factual deficiency and procedural error.  The Court disagrees on both accounts.

As a factual matter, multiple consultative acceptable medical sources relied upon by the ALJ addressed Ms. Harry's BPD diagnosis, including Dr. Howell, an examining consultant.  [R. 19–20 (citing Ex. 9F, 10F, 11F)].  Dr. Howell, who simultaneously confirmed the BPD diagnosis, opined that Ms. Harry's "ability to relate to others, including peers, supervisors and the general public, was within normal limits."  [R. 653].  Dr. Howell was informed about Claimant's recent work history, as was Dr.

---

[19]  As noted previously, the ALJ did not specifically mention that Dr. Sandhu evaluated Ms. Harry in 2009 and made diagnoses of specific mental impairments including BPD.

33

Berger, because both expressly noted the difficulty Ms. Harry encountered with her supervisor at her last long-term job with a photography studio.  [R. 636, 652]. Significantly, neither Dr. Berger nor Dr. Howell opined that Claimant had social limitations with respect to her ability to interact with co-workers.  The ALJ expressly found Dr. Berger's and Dr. Howell's opinions "consistent with treatment notes" and Claimant's "extensive activities of daily living."  [R. 20].  As a result, the ALJ gave "significant weight" to the medical opinions of both Dr. Berger and Dr. Howell. [R. 20].

The ALJ assigned "little weight" to the portion of Dr. Logan's mental RFC opining that Claimant should be restricted to a work environment "where interaction with coworkers is brief and superficial." [R. 20].  As mentioned, *supra*, Dr. Logan also commented on Claimant's history of conflicts with supervisors and mood swings.  [R. 670].  The ALJ explained that Dr. Logan's opinion that Ms. Harry had a limited ability to interact with co-workers was "inconsistent with treatment notes and Dr. Berger's opinion that Claimant's ability to work with others and the general public was within normal limits." [R. 20].  Indeed, as previously noted, the Claimant personally reported to Dr. Berger that she typically has had "good relationships with co-workers."  [R.

633].  The ALJ is appropriately tasked with weighing the evidence – not the Court. See Phillips, 357 F.3d at 1240 n.8.

With respect to alleged procedural error, there is no mental RFC opinion from any treating psychiatrist or other acceptable medical source contrary to or more restrictive than Dr. Howell's RFC opinion.[20]  Thus, the ALJ did not need to assign weight to the *diagnosis* (as opposed to mental RFC opinion) rendered by Dr. Sandhu and, as such, the ALJ did not run afoul of the treating source rule.[21]

"Absent 'good cause,' an ALJ is to give the medical opinions of treating physicians 'substantial or considerable weight.'"  Winschel v. Comm'r of Social Security, 631 F.3d 1176, 1179 (11th Cir. 2011) (quoting Lewis, 125 F.3d at 1440; citing 20 C.F.R. §§ 404.1527(d)(1)–(2), 416.927(d)(1)–(2)).  "[T]he ALJ must state with particularity the weight given to different medical opinions and the reasons therefor."

---

[20] Ibarra's treatment notes and counsel as to Claimant's ability to manage her time and activities may inform but do not supercede Dr. Howell's mental RFC opinion.

[21] For purposes of the Social Security Act, "'medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions.'" Id. at 1178–79 (quoting 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)).

AO 72A
(Rev.8/82)

Id. (citation omitted).   "'In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence.'" Id. (quoting Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir.1981)).  Despite not expressly discussing Dr. Sandhu's BPD diagnosis, the ALJ properly relied on Dr. Howell's diagnosis of BPD and opinion concerning Claimant's functional limitations.

The Court also disagrees with Claimant that the unpublished decision in Baez v. Comm'r of Social Security, 2016 WL 4010434 (11th Cir. 2016), is controlling or persuasive in this instance. In Baez, the court vacated and remanded to the Commissioner for further proceedings because the ALJ failed to assign weight to the diagnosis provided by one of three treating physicians (Dr. Chin) as well as several other medical source opinions including the opinion of an examining consultative physician (Dr. Gottlieb).[22] Baez, 2016 WL 4010434, at *5 (citing Winschel, 631 F.3d

---

[22] For various reasons, the ALJ's error in failing to discuss or assign weight did not constitute reversible error as to each medical source. Baez, 2016 WL 4010434, at *3–5. In addition to the ALJ's failure to assign weight to Dr. Chin's diagnosis and treatment records, failure to discuss Dr. Gottlieb's opinion was deemed reversible error because Dr. Gottlieb also suspected that claimant had pseudarthrosis – an opinion that corroborated Dr. Chin and another examining consultant (Dr. Yates) whose opinion the ALJ assigned "some weight." Id., at *4–5. Dr. Yates attributed the claimant's subjective complaints of pain as merely post-surgical pain. Id., at *5. The Baez court noted that the RFC might have been altered had the ALJ considered the opinion. Id.

AO 72A
(Rev.8/82)

at 1179).  The ALJ discussed Dr. Chin's treatment notes, including his opinion that

Baez might have pseudarthrosis but did not assign any weight to Dr. Chin's opinion.

Id., at *2.  The panel rejected the Commissioner's argument that Dr. Chin's records

only included diagnoses and did not establish Baez's physical limitations.  Id., at *4.

The panel explained that "[m]edical reports should include medical source statements

that discuss what a claimant can still do despite any impairment." Id. (citing 20 C.F.R.

§§ 404.1513(b)(6) and 416.913(b)(6)).   The court stated that "'the lack of the medical

source statement [does] not make the report incomplete'" and "does not relieve the

ALJ from the duty to assign substantial or controlling weight to the opinion of a

treating physician absent good cause to the contrary." Id. (quoting §§ 404.1513(b)(6),

416.913(b)(6)).   Accordingly, notwithstanding the absence of any medical source

statement (or RFC opinion) from Dr. Chin, the Baez court held that the ALJ's omission

was reversible error.[23]  Id.  Significantly, the court observed that, "[e]ven without the

medical source statement, Dr. Chin's records were comprehensive." Id.

---

[23] But see McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1988) (severity of medical condition is measured by its effect upon a claimant's ability to work); accord Sellers v. Barnhart, 246 F. Supp. 2d 1201, 1211 (M.D. Ala. 2002) ("A diagnosis alone is an insufficient basis for a finding that an impairment is severe.").

Baez is readily distinguishable.  Unlike the facts of Baez, the lack of a definitive diagnosis is not a concern in this case since Ms. Harry's BPD diagnosis is not being questioned and was considered by the ALJ.  In addition, the treating physician in Baez had "comprehensive" treatment records that the ALJ assigned no weight.  Here, Dr. Sandhu's original diagnosis is found within a two-page document.  [R. 613–14].  The record is summary in style and only includes a brief history of Ms. Harry's past and present illnesses, treatment and medications followed by prescribed medication, assessment and treatment plan.  [R. 613–14].  Dr. Sandhu provides no short-term or long-term prognoses and no discussion of occupational restrictions or limitations.  [R. 613–14].  It appears from the record that Dr. Sandhu conducted periodic reviews and reduced his subsequent opinions to a single page that merely identify AXIS I through V diagnoses and GAF scores (which were recognized by the ALJ).  [R. 598–606, 628–29].  According to Dr. Sandhu, Ms. Harry's primary AXIS I diagnosis was major depressive disorder and primary AXIS II diagnosis was BPD.  [R. 598–606, 628–29]. Dr. Sandhu's AXIS IV diagnosis was unidentified "psychosocial and environmental problems."[24]

---

[24] The notes below this heading generally indicate the existence of one or more of the following:  other psychosocial problems; social environmental problems; and primary support group problems.  [R. 598–607].  The November 1, 2010, entry adds

AO 72A
(Rev.8/82)

In conclusion, because there is no mental RFC from DeKalb MHC, the ALJ did not err in relying on the consultative opinions of Drs. Berger, Howell, and Logan, which were in large part deemed to be consistent with the evidence as a whole.  [R. 20].   In other words, there is substantial evidence demonstrating that Ms. Harry's "moderate" restriction in social functioning did not warrant any additional functional limitations.[25]

### 5.   The ALJ's Credibility Determination Is Supported By Substantial Evidence

The Court also finds that the ALJ's credibility determination is supported by substantial evidence.  When a claimant seeks to establish disability through subjective testimony concerning pain or other symptoms, a "pain standard" established by the Eleventh Circuit applies.  Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991); see also Crow v. Comm'r, Social Security Admin., 571 Fed. Appx. 802, 807 (11th Cir.

_____

occupational problems but provides no other detail.  [R. 604].

[25] The record does not make clear why treatment providers at DeKalb MHC were not asked to provide opinions concerning Ms. Harry's mental RFC. The Eleventh Circuit observed in Baez that a claimant cannot fault the ALJ for failing to consider what the claimant did not provide or include in the administrative record.  See Baez, 2016 WL 4010434, at *4 (speaking about a medical opinion provided to the Appeals Council after the ALJ rendered an unfavorable decision and stating that "Baez cannot challenge the ALJ's failure to accord weight to an opinion that Baez did not provide").

AO 72A
(Rev.8/82)

2014) ("The 'pain standard' is applicable to other subjective symptoms as well.") (citing Dyer, 395 F.3d at 1210).  The claimant can satisfy this standard by showing: "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing Holt, 921 F.2d at 1223).

Where a claimant's testimony, if credited, could support the claimant's disability, the ALJ must make and explain a finding concerning the credibility of the claimant's testimony.  See Viehman v. Schweiker, 679 F.2d 223, 227–28 (11th Cir. 1982).  "If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so." Wilson, 284 F.3d at 1225 (citing Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987)).  The ALJ's evaluation of a claimant's subjective symptoms should be guided by the following relevant factors: (1) daily activities; (2) location, duration, frequency, and intensity of the claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication the claimant takes to alleviate his symptoms; (5) treatment received and measures used, other than medication, for the relief of symptoms; and (6) any

40

other factors concerning the functional limitations and restrictions due to the claimant's symptoms.  See 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p.  "A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court."  Foote, 67 F.3d at 1562 (citing MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986)).

In this case, the ALJ found that Ms. Harry's objectively determined medical conditions could reasonably be expected to give rise to some of the symptoms she complains of.  [R. 21].  Nonetheless, the ALJ stated:

> With regard to credibility, the undersigned finds the claimant is not fully credible regarding the intensity and persistence of her symptoms. At her hearing, the claimant, and her mother, described severe physical and mental limitations.  However, treatment notes and the medical evidence a whole, does not support such severe limitations.  Notably, treatment notes fail to document complaints of frequent panic attacks. With regard to physical impairment, physical examinations have been unremarkable except for limited range of motion secondary to body habitus.
>
> Further, the claimant's allegations of severe limitations are inconsistent with her activities of daily living. Treatment notes dated June 21, 2011, document that the claimant was volunteering 30 hours per week at an animal shelter.  Further, treatment notes dated May 19, 2011, document the claimant was earning money by babysitting. Treatment notes dated, May 2, 2012, document the claimant had a business making jewelry and was preparing for a show (Ex. 16F).
>
> Consequently, the evidence shows a higher level of functioning than the claimant and her mother described at the hearing.

41

[R. 21].   Thus, the ALJ in this case did not simply make "a broad rejection" of Claimant's assertions concerning the "intensity, persistence, and limiting effects of her symptoms."   Dyer, 395 F.3d at 1211.

In support, Claimant relies on Himes, 585 Fed. Appx. 758.   In Himes, the Eleventh Circuit found error in the ALJ's credibility determination, noting that the ALJ had omitted from his decision a discussion of certain of the claimant's diagnosed mental illnesses.   Dechow v. Colvin, 2015 WL 5244978, at *1 (N.D. Fla. September 4, 2015) (citing Himes, 585 Fed. Appx. at 767).   More specifically, in outlining the reasons for the credibility finding in Himes, the ALJ identified personality disorder as one of several diagnosed mental impairments and stated that there was no evidence that the impairments so identified prevented claimant from engaging in some type of work activity. Himes, 585 Fed. Appx. at 767.   The ALJ omitted discussion of additional mental impairments, namely, social phobia, attention deficit hyperactivity disorder, and post-traumatic stress disorder.   Id.   While deemed harmless in other aspects of the sequential evaluation process (i.e., omission in discussing the existence of medically determinable impairments in first step of evaluating subjective complaints), in the context of evaluating Himes's credibility, the ALJ's omission was not harmless error. Id. The court explained that "without considering all of Himes's diagnosed

42

impairments, the ALJ's conclusion that Himes's statements about his subjective symptoms [were] not credible to the extent they conflict with the RFC [could] not [be] supported by substantial evidence." Id. (citing Crawford, 363 F.3d at 1158; and Lewis, 125 F.3d at 1440). Most importantly, and contrary to the record in this case, the ALJ did not have an "acceptable medical source" opinion as to the functional limitations attendant to the pertinent diagnosis as well as the combination of all of Claimant's impairments in either Himes nor Baez. In this case, as evident from the detail within Dr. Howell's evaluation, the ALJ did not render her credibility finding without an adequate appreciation of Claimant's impairments, severe and non-severe.[26] See Character v. Colvin, 2015 WL 1481114, at *11 (N.D. Ga. March 31, 2015) (discussing Himes challenge that ALJ did not discuss all diagnosed impairments and

---

[26] Another factual distinction in Himes is that the ALJ also attributed some of the claimant's non-exertional symptoms to "more of a temper problem," which the Eleventh Circuit rejected as not engaging the physicians' opinions diagnosing Himes with mental impairments. Himes, 585 Fed. Appx. at 767 (reversible error found where "the ALJ's stated reason for finding claimant less than fully credible is based on the ALJ's conjecture that Himes's problems are based on temper as opposed to mental issues"). Counsel for Ms. Harry attempted to draw an analogy to the Himes ALJ's "more of a temper problem" error by pointing to the ALJ's discussion of Claimant's suicide attempt. [R. 19]. However, the ALJ here did not engage in conjecture but instead reported that Claimant admitted to mental health professionals that she did not really want to succeed in killing herself but rather sought attention. [R. 19].

affirming the denial of benefits while observing that, "The ALJ's decision is, of course, not perfect.").

**B.      ALJ's Alleged Failure To Show That Plaintiff Is Capable Of Working "In An Ordinary Work Setting" Without Special Accommodations**

Claimant's next asserted error on appeal is the ALJ's failure to show that Ms. Harry is capable of working "in an ordinary work setting" absent accommodations for her obesity.  Claimant contends that in order to perform sedentary work, she will require a special bariatric chair designed to accommodate her weight. [Doc. 10 at 16–17].  Claimant points to the United States Department of Labor's Job Accommodation Network ("JAN") in support of the notion that special chairs are required to accommodate individuals weighing over 300 pounds.  [Doc. 10 at 16 & n.81].

The Court first notes that this issue was not raised by Claimant at any stage of the underlying administrative proceedings before the Commissioner.  Of particular significance, this argument was not made by the Claimant's attorney representative at the evidentiary hearing before the ALJ, which would have allowed the VE to consider the need for special accommodations and any impact on the occupational base.  To the extent Claimant suggests that the ALJ committed procedural error by failing to

AO 72A
(Rev.8/82)

consider and ask the VE about Claimant's potential need for a bariatric chair, the undersigned is not persuaded.

Pursuant to SSR 96-8p, the RFC assessment must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  <u>See</u> SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).  According to Claimant, the phrase "in an ordinary work setting" has been construed to mean "without any special accommodation that employers do not make for typical employees."  [Doc. 10 at 16 & n.79 (citing SSR 00-1c)].  Claimant appears to be asking this Court to create new law by imposing an additional affirmative obligation on the Commissioner – an invitation the undersigned declines.  SSR 00-1c deals with the interplay between the Social Security Act ("SSA") and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and a claimant's pursuit of relief under both statutory schemes.  <u>See</u> SSR 00-1c, 2000 WL 38896 (January 7, 2000).  SSR 00-1c follows the Supreme Court's decision in <u>Cleveland v. Policy Mgmt. Syss. Corp.</u>, 119 S. Ct. 1597 (1999), which clarified that an individual's application for social security disability insurance benefits does not necessarily preclude an individual from successfully pursuing a simultaneous claim under the ADA. 119 S. Ct. at 1601–04. SSR 00-1c does *not* require the Commissioner to consider "reasonable

45

accommodations" for alternative work at step five of the sequential evaluation process. In fact, SSR 00-1c discusses the burden that such a requirement would place upon the Commissioner in terms of application and in stretching already over burdened administrative resources. Id., at *5 (discussing the number of claims for disability benefits received annually by the SSA, its limited administrative resources, and practical difficulty with trying to evaluate "reasonable accommodation" – which could turn on "highly disputed workplace-specific matters).

Further, the regulations governing obesity recognize that a claimant "may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling." SSR 02-1P, 2002 WL 34686281, at *6 (September 12, 2002). In this case, there is no medical evidence that Ms. Harry has any functional limitation that would impede her ability to sit while performing sedentary work. The ALJ noted that Claimant should "never climb ladders, ropes or scaffolds and can only occasionally climb stairs or ramps" and "is limited to occasional bending, balancing, stooping, crawling, kneeling or crouching." [R. 17].

Finally, the Court's independent research as to functional limitations and special accommodations for claimants weighing over 400 pounds, produced no case law to support Claimant's argument. See, e.g., Coldiron v. Comm'r of Social Security, 391

46

Fed. Appx. 435, 442–43 (6th Cir. 2010) (affirming denial of benefits for claimant weighing in excess of 400 pounds as capable of performing range of sedentary work with no mention of special accommodations); <u>Riordan v. Comm'r of Social Security</u>, 297 Fed. Appx. 194, 197 (3rd Cir. 2008) (affirming denial of benefits for claimant who weighed 400 pounds where ALJ found claimant capable of performing the full range of sedentary work with no mention of special accommodations); <u>and</u> <u>Lovelace v. Barnhart</u>, 187 Fed. Appx. 639, 643–44 (7th Cir. 2006) (affirming ALJ's rejection of 2-hour sitting limitation within opinion of treating physician and finding claimant weighing approximately 400 pounds capable of sitting for six hours a day with the opportunity to change positions every forty-five minutes; no mention of special chair or other accommodations).

The ALJ properly relied upon the testimony of the VE in arriving at the conclusion that Ms. Harry could perform other work at step five of the sequential evaluation process.   [Doc. 11 at 13–14].   Substantial evidence supports the ALJ's finding that Claimant could perform jobs, namely, cashier, small product assembler, and product sorter, jobs that exist in significant numbers in the national economy and that Claimant is, therefore, not disabled as defined by the Social Security Act.

AO 72A
(Rev.8/82)

### V.    Conclusion

Based on the forgoing reasons and cited authority, the Court finds that the decision of the ALJ was supported by substantial evidence and was the result of an application of proper legal standards.   It is, therefore, **ORDERED** that the Commissioner's decision be **AFFIRMED**.  The Clerk of Court is **DIRECTED** to enter judgment in favor of the Commissioner.

**SO ORDERED THIS** 8th day of September, 2016.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

48